CASE 29.—ACTION BY THE SOUTHERN ENGINE & BOILER
WORKS AGAINST THE CITY OF BARDWELL FOR
THE PRICE OF AN ENGINE USED IN OPERATING
ITS ELECTRIC LIGHT PLANT.—November 5.

# City of Bardwell v. Southern Engine and Boiler Works

Appeal from Carlisle Circuit Court.

R. J. Bugg, Circuit Judge.

Judgment for plaintiff. Defendant appeals.—Affirmed.

1. Sales—Warranty—Right to Recover Price.—Under a contract
of sale of an engine, with guaranty that the material and
workmanship entering into it shall be first class, and that
any defective part will be replaced without charge, the exist-
ence of defects not preventing the operation of the machinery,
but which could be cured by supplying other pieces of
machinery in place of the defective ones, will not prevent
recovery of the purchase price, the purchaser, though having
a report of its expert as to defects, failing, on demand, to
give the seller information as to the defects claimed, and
refusing to give opportunity to make needed repairs, seeking
a rescission; and the seller, as it informed the buyer, having
been ready and willing to supply any deficiencies, which was
all that the contract obliged it to do, and all that the buyer
could demand.

2. Mandamus—City Debt—Compulsory Tax Levy—Constitutional
Limit.—A city having contracted a debt, which, under Con-
stitution section 158, it had no power to contract, because
its indebtedness already exceeded the limit fixed therein,
its officers can not be required to levy a tax to pay the debt.

3. Sales—Seller's Lien—Enforcement—Defense by Municipal
Corporation.—Where a city has bought an engine which it
had the power to purchase, except that its debt already

City of Bardwell v. Southern Engine and Boiler Works.

exceeded the limit fixed by Constitution section 158, and as between it and the seller the latter, under contract, has a lien on the engine for the deferred payment, the city, which will not, and can not be compelled to, pay, may not, though using the engine as part of its electric light plant, retain it, and give the seller the option merely to rescind the contract, and return the partial payment made; but the seller may enforce his lien by sale.

J. M. NICHOLS & SON for appellant.

We contend that both contract and note were void from the beginning, and that they were void as to both parties; that the city acquired no title to the engine, but that it remained the property of appellee; that the $1,050.00 paid to appellee was wrongfully paid, and that appellee knew, or must as a matter of law be adjudged to have known, that the agents of the city had no right to make said payment, and therefore knew that it was not the act of the city, and it should be compelled to take its engine and pay back this money, and we respectfully pray for a reversal a . a judgment accordingly.

AUTHORITIES.

Constitution, section 158; Beard v. Hopkinsville, 95 Ky. 239; City of Covington v. MyKenna, 99 Ky. 508; Murphy et al. v. City of Louisville 9 Bush 189; Trustees of Bellvue v. Hohn, 82 Ky. 1; Am. & Eng. Ency. of Law, vol. 20, p. 1180 (2nd Ed.); Chaska v. Hedman, 53 Minn. 525; Griffin v. Shakapee, 53 Minn. 528.

JOHN E. KANE for appellee.

If we understand the rule announced by the appellate court with reference to warranties like that in this case, it became the duty of appellant to give to appellee, within a reasonable time, notice of any failure of the engine to fill the warranty, and that if it kept and used the same without giving such notice to appellee within a reasonable time, that it becomes estopped to set up and rely on such a breach, or in other words, will be held to have waived the provisions of the warranty, and to have accepted the engine, as fully complying with the terms of the contract. (Wisdom, &c. v. Nichols & Shepherd Co., 97 S. W. 18; Sprout, Waldron & Co. v. Hunter, 98 S. W. 1006.)

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

In June, 1905, the appellant city of Bardwell purchased from appellee an engine to be used in operating its electric light plant. It contracted to pay for the engine $1,550. Six hundred dollars of this amount was paid in cash, $450 in an old engine, and for the remaining $500 the city executed its note due in June, 1906. The note, as well as the contract, contained the stipulation that the city had received the engine from the Southern Engine & Boiler Works "with the express agreement and understanding that the title of said machinery is now and shall remain in the said Southern Engine & Boiler Works until the note is paid in full; and it shall have the right in case of non-payment at maturity of said note, or at any time it deems itself insecure, or if the property is sold or removed from the district where located, to enter and retake immediate possession of said property wherever it may be and remove the same." The contract also contained the following guaranty: "The material and workmanship entering into the construction of this engine shall be first class in every respect, and any defective part will be replaced by us without charge. We also guarantee this engine to run smoothly with close regulation under varying loads and steam pressure and to be as economical in the use of steam as any engine of its class." Failing to pay the note at maturity, the appellee instituted this action against the city. It asked for judgment for its debt, interest, and costs, and that it be adjudged a lien on the engine to secure the payment of the same. To this petition the city answered that the engine was not

constructed of first-class material, but that much of the material entering into its construction was defective in many respects, and also alleged that the workmanship was inferior, and that, by reason of these defects, the engine was not worth over $500 when delivered to the city. It made its answer a counterclaim, and asked that the note sued on be canceled, and that it have judgment over against the company for $550. To this pleading the engine company replied that it had repeatedly offered to fully perform its guaranty by replacing without charge any defective or inferior parts, but that the city had refused to permit it to do so, and it renewed its offer to fully perform its contract obligation. A rejoinder was filed by the city, in which it stated that it was willing to accept such an engine as the company warranted the engine purchased to be, but that, if the company would not do this, then it offered to rescind the contract, providing the company would return to it the $1,050 paid on the purchase price and surrender the note sued on. Subsequently the city filed an answer, setting out that at the time the contract was entered into, and the note sued on executed, it was indebted largely in excess of the constitutional limit as fixed in sections 157 and 158 of the Constitution, and that the indebtedness assumed in the purchase of the engine was unauthorized and the note executed as evidence of it void. The case, after being prepared for trial, was submitted to the court, and a judgment rendered in favor of the engine company for the amount of its note and interest; and it was further adjudged that, to secure the payment of the same, it had a lien upon the engine. Of this judgment the city complains.

In respect to the question that the city had no

authority to purchase the engine because its indebtedness at the time exceeded the limitation provided in the Constitution, we may say that the evidence indicates that the contention of the city upon this point is correct. So that we will consider the case as if the city had no authority to buy the engine or create any indebtedness for that purpose.

Upon the issue presented as to whether or not the engine fulfilled the guaranty, the evidence is conflicting. Indeed, the weight of it tends to support the conclusion that the engine in some particulars, especially in material, was not what it was guaranteed to be. The engine was installed as a part of the electric plant in July, 1905, and the evidence shows that it operated the plant continuously from the time it was installed until the last depositions in the case were taken in the summer of 1907. Presumably the city, as it superseded the judgment, is yet using the engine for the purpose for which it was bought. Soon after the engine was installed, the city notified the engine company that the engine was not rendering satisfactory service, and pointed out several defects in its material and construction. In response to this letter, the company sent one of its agents to inspect the engine. After making an inspection, he reported to the company that the engine fully came up to the stipulations contained in the contract, and that he found no defects either in material or construction, although a number of witnesses who testified for the city, some of them being experienced machinists, were able to discover defects in both these particulars. It may, however, be here remarked that the defects in material or construction, although causing some inconvenience and annoyance, as well as additional expense, did not seriously interfere with the running of the engine, or

prevent it from performing the work it was desired it should do. Subsequent to this, and before the institution of this action, in October, 1906, considerable correspondence passed between the city and the company in respect to other indebtedness of the city to the company, and also concerning the engine. Finally, in June, 1906, for the purpose of definitely ascertaining whether or not the engine fulfilled the contract, it was agreed between the city and the engine company that two experts, one to be selected by each of the parties, should examine the engine and report the result of their inspection. The correspondence between the parties leading up to the selection of these experts clearly shows the attitude of the engine company. In July, 1906, it wrote to the city that it was perfectly willing to make good any defects that existed in the engine, and offered to send an experienced and competent machinist to examine it and supply any defects, and stay with it until the city was satisfied that it was the kind of an engine the city bought. It further wrote that it sold the Coyliss engine to be in first-class condition, and that was the kind it proposed to make it if it was not such. In reply to this, the city wrote that it wished to have a competent man to go over the machinery with the expert from the company, and agreed to abide by what this man reported. In July, 1906, these experts met and inspected the engine. At this time it had been in use by the city for about one year.

The expert selected by the city reported to it as follows: "As requested by Mr. Ponder, a member of your board, I made an examination of the Coyliss engine at electric light plant at Bardwell, Ky. I found it running smoothly and a steady light from lamp spoke well for speed regulation. The cylinder head

and two of valve bonnets are honeycombed, and should be replaced by better castings. Your engineer said that (the engine was running and I could not examine it) the crossheads come so close or strikes the gland when the stuffing box is full. This should be remedied by the builder before engine is accepted. He also complained that the stuffing box was back so deep in the frame that he could not get to it while running. This, of course, is annoying to the man running the engine, and may cause him to stop sometimes to adjust the glands; but I can see no remedy for this. Aside from the defective casting and the closeness of the cross-heads to the cylinder head, I consider it a well-built, substantial engine." The expert selected by the company made the following report to it: "Met Mr. Harrison, their expert from Cairo, this evening, and, after going over the engine into details, could only find a few minor faults as to defective castings. The only one we found was a cylinder head which had a spongy place in it about the size of a dime right in the fillett, which was disclosed by oil seeping through. Found the crank end stem broken across lower half of housing; would not say it broke from defective casting from nature of break. I would say was broken by being caught in some manner or dash pot rod had been lengthened out which would cause it. Found grab claws had been taken off and set screws put in, which makes them look very bad. The only other fault he had to find, and that was in the design, was piston rod nut ran too close to stuffing box. He suggested that we replace cylinder, also face off piston rod nut, and stuffing box gland, which would give more clearance, and that he would make written report to board to that effect. In his opinion that would make engine first-class job; and I would sug-

gest we furnish new pair of grab claws to replace those that have been ruined. Also set of die plates.''

Immediately upon receiving the report from its expert, the company wrote the city the following letter: ''The machinist sent by Southern Engine & Boiler Works to examine the engine sold you some time ago has returned, and made his report to the company. He reports that he found the engine in comparatively good condition, and for all practical purposes no defects in same that would in any way impair its usefulness. He reports that there is a defective casting in the cylinder head which will permit oil to ooze through; that he found that the grab claws had been taken off, and some set screws put in their place; and also the end of the crank where grab claws had been broken. I now write to say that a new cylinder head will be replaced and a new pair of grab claws put on, as well as a new crank end for the grab claws. We will also turn off face of piston rod nut and stuffing box gland to give more clearance for the piston rod. These matters are to be done without any additional cost to you and done whenever it may suit your convenience, and, when demanded by you, it will be whenever you will give permission to do so. We are ready and willing to do this.'' It seemed that the city did not answer this letter, nor did it notify or inform the company of the report made by its expert, nor have sent to it a copy of his report, and a few weeks afterwards the company again wrote, expressing its willingness to supply all the defects of which it had notice, and also said: ''If there are any defects connected with this machinery under the contract, the Southern Engine & Boiler Works has the right to make it good, but, of course, they are entitled to be notified what they are. And, as stated above, I understand you had

an expert to examine it for this purpose, and certainly
the Southern Boiler & Engine Works should be
informed of all the defects that he may have found,
so that they could replace it or make it good.'' In
reply to this letter, the city in August, 1906, wrote the
following: ''I am requested to reply to yours of the
30th of July and the 21st, and say that it is the opin-
ion of the board that you can not patch this engine in
question enough to make a first-class one, and there-
fore they prefer that you do not begin to repair it.
And in their opinion it will be necessary to fulfill the
contract. It is plainly evident to the writer that a
considerable compromise on the part of your com-
pany will be necessary for us to ever come to a settle-
ment.'' This concluded all efforts to adjust the mat-
ter between the parties without litigation.

Assuming that there were defects in the material
used in the construction of the engine, and the evi-
dence shows that there were, it became the duty of the
company under its contract to cure these defects by
supplying other pieces of machinery to take the place
of the inferior ones. That it was somewhat negligent
in this respect may be conceded, but it is also true
that the defects were not of such a character as to
prevent the operation of the engine, and it may safely
be said that those reported by the expert selected by
it are the only ones that are definitely and certainly
pointed out as being necessary to remove in order to
bring the engine up to the guaranty. When the city
received the report of its expert, it should have sent
to the engine company a copy, and demanded of it that
his recommendations be complied with. The corre-
spondence shows that the city did not do this, and,
further, that the company was ready and willing to
perform its contract and supply any deficiencies in

the engine. This was all its contract obliged it to do, and all that the city had a right to demand. It is apparent that the city authorities, doubtless feeling that the engine company had not primarily complied with its contract, wished to rescind it, and for this reason refused to permit the company to make the needed repairs. So that, unless the constitutional question raised presents an obstacle in the way of the affirmance of the judgment of the lower court, our conclusion is that it is correct. Upon this question the argument is strongly pressed that the city had no authority to create the indebtedness in the purchase of the engine, that, therefore, the contract was void, and the only remedy of the company was to apply to the court for a mandamus to compel the municipal authorities to levy a tax to pay the debt. If, however, it be a fact as is stated in the pleading on behalf of the city and in the argument of its counsel, that the city at the time it purchased this engine had already incurred indebtedness in an amount exceeding 3 per centum of the value of the taxable property estimated by the assessment next before the last assessment previous to the incurring of the indebtedness, the remedy suggested would be of no avail, because the court could not compel the city authorities to levy a tax when the limitation provided in section 158 of the Constitution had been exceeded, when the indebtedness for which it was sought to impose a tax was created. Although the court might compel municipal authorities to levy a tax to pay a debt that they had the power to create, we do not understand that it could require them to levy a tax in direct violation of the Constitution.. So that, if the appellee company has any remedy at all, it is the one adopted in the lower court.. A rescission would not afford adequate or satisfactory relief, and

section 157 of the Constitution provides in part that: "No county, city, town, taxing district, or other municipality shall be authorized or permitted to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose; the indebtedness contracted in violation of this section shall be void. Nor shall such contract be enforceable by the person with whom made, nor shall such municipality ever be authorized to assume the same." We have then presented this condition of affairs: The city has the use and is in the possession of a valuable engine that it purchased from the appellee company; but, when the company attempts to collect the note executed by the city for the purchase price of the engine, the city responds: "We have your property. We are using it for public and governmental purposes. We have not paid for it, and do not intend to. You can not compel us to levy a tax to pay your debt because our tax rate exceeds the constitutional limit. You can not take a personal judgment against the city because the contract was made in violation of the Constitution, and is not enforceable, and you can not take the engine upon which you have a lien because it is used in connection with our electric light plant and is necessary in its operation. Therefore you are remediless unless you accept our offer to rescind the contract." There is no constitutional or statutory law in this State that will permit municipalities in cases presenting facts like this to retain possession of property and refuse to pay for it or afford relief, unless the seller will accept a rescission upon equitable terms. Within the constitutional limitation, the city had the right

under section 3637 of the Kentucky Statutes of 1903 to purchase an engine for use in connection with its water and light plant; and, as between the company and the city, the company under its contract had a lien upon the engine to secure the payment of the note, and this lien it had the right to enforce by sale of the engine for the satisfaction of its purchase money debt. This identical question was before this court in Board of Trustees of Fordsville v. Postell, 121 Ky. 67, 88 S. W. 1065, 28 Ky. L. R. 37. In that case the trustees of Fordsville established a school and issued bonds to the amount of $4,000 on behalf of the district for the purpose of providing it with a lot, school-house, and suitable furniture. The bonds were sold and the proceeds used for this purpose. The bonds were issued without a vote being taken authorizing the issual, and were adjudged to be void. Thereupon the holders of the bonds instituted an action in equity asking that the lot, house, and furniture, which were purchased with the proceeds of the bonds, be sold to satisfy them. In granting this relief the court said: "The money which the plaintiffs paid is distinctly traced into the school-house and lot and the furniture, and no other money went into them. This property can be reclaimed without taking any other property with it or injuring any other person or interfering with his rights. * * * No liability, direct or indirect, may be imposed upon the school district under the bonds in question. It is not liable on the bonds, nor can it be liable by indirection in any way; but, if we ignore the bond transaction altogether, what have we? The district received $4,000 from the bondholders. The bonds being void, the district should have returned the money to the bondholders. If the bondholders had learned of the invalidity of the bonds

while the district still had the $4,000 in its treasury, which they had paid to it, manifestly a court of equity would have required the district to pay back their money to them. It was money obtained by a mutual mistake. While under the Constitution no liability would attach to the district for the money if it had lost it, or if it had spent it, and the fund could not be identified and followed, where it may be followed and identified, there is no more reason why property which represents the fund should not be returned than there would be for not returning the money if it had been placed in a bag and the district had the bag locked up in its safe. The purpose of the Constitution is not to enrich municipalities at the expense of innocent people who deal with them, and, when they repudiate their bonds, they must act honestly. A loss must not be placed upon the district, but, when justice may be done without inflicting any loss upon the district, equity will lay hold of the conscience of the parties, and make them do what is just and right. * * * We see no reason why the right to follow a fund should not be applied against municipalities under the clause of the Constitution above quoted just as it is against other persons obtaining the property of another under a void contract, where the fund may be identified, and is separated from other property of the municipality.'' This opinion, sound in law as well as morals, is conclusive of the question we are now considering. There is no difficulty in .identifying the property. There are no other liens on it. Nor does it appear that any other property will be seriously injured by the sale of it. True, if the engine should be removed, the city might be deprived of the use of its electric light plant until it obtained another engine; but, except in this particular, the removal of the engine

will not impair the value of the plant. It would be manifestly unjust and inequitable under the circumstances presented by this record to permit the city to keep this engine and not pay for it. The constitutional provision in question is one of the most valuable clauses in the instrument, and it is not our purpose to in any wise impair its usefulness or deprive the taxpayers and citizens of municipalities of the protection it affords. But it was not designed to enable cities or towns to perpetrate fraud.

The judgment of the lower court is affirmed.